Richard Rainer from the Federal Public Defender's Office in Tucson, Arizona. I represent Franklin Lloyd Antone. I'd like to reserve three minutes of time for a vote. Raise the mic just a little. Thank you. Thank you. The case against Franklin Antone was fundamentally weak but bolstered by three erroneous decisions by the District Court. The case was fundamentally weak because the alleged victim here gave conflicting stories. She felt pressured by the detective to change her timeline, and at one point when she was asked what had happened to her by the detective, she recounted what her aunt had told her about what Mr. Antone had done to the aunt more than 17 years before. But most importantly, there was testimony that at one point she recanted and said that she lied and made it up. This fundamentally weak case was bolstered by three erroneous decisions by the District Court. One, failing to suppress evidence on Miranda's voluntariness grounds. Two, exclusion of the Mr. Antone's expert on the social psychology of interrogations and false confessions. And three, by the admission of propensity evidence. First, I'd like to talk about whether Miranda was violated because Mr. Antone was in custody during his hour-and-a-half interrogation. Exactly where was the venue? This was the — this was — occurred on the Tejana-Adum Indian Nation in the District of Arizona. No, that's not what I mean. Exactly where did the interrogation take place? It took place — He went at request. That's correct, Your Honor. He was requested to come to the police station, or he was told that he wanted the detective — He had a choice between the police station and his home. That's correct. But he wasn't told what it was about. He just was told that there was something that he wanted to talk to him about. Now, this defendant had been a judge? He had been a tribal judge, which requires no legal training on the Tejana-Adum Indian Nation. So this, where he went, would be familiar surroundings for him. Is that right? Well, not necessarily the interrogation room. I don't — I wouldn't say that someone as a judge would necessarily have even been to the interrogation room. And it was specifically designated as such. In this case, the district court found that all of the five factors that are ordinarily considered in a case such as this, to determine custody, but for the fact that Mr. Anton was told that he was free to leave, everything else suggested that he was in custody. And, for example, how he got there, the language used to summon him, the district court found that although Mr. Anton was not summoned there as a suspect, that very soon after he arrived, it was then made clear. And the district court found that a reasonable person would have felt — not have felt free to leave once he was told that he was subject to arrest. And once he arrived there, only then was he told that he was subject to arrest. And if you look at the — You said that we may arrest you, but we're not going to take you into custody tonight. We're not going to make you stay here. Is that what you said? Well, look at what the district court said, or concluded, in terms of whether or not he would be arrested. It said — it said, but he was also told he could only remain out of custody until a later time when charges were formally filed against him and he would be allowed to, quote, turn himself in instead of having law enforcement arrest him at his home if he talked to police and confirmed the incriminating allegations against him. So even the district court found that his being able to leave and only being arrested later was conditioned upon him actually giving a statement at that time. And there was time separating the initial — this initial statement. At the very beginning, he says, you know, I asked you to come here and talk. And then he says, you're free to leave any time you like. Then there's some small talk that goes on for about 10 minutes. And only about 12 minutes later, then the tone changes. At that point, it's made clear that Mr. Antone is a suspect. Mr. Raynor, is it significant that the detective left the door of the interrogation room open, never handcuffed him, told him he could get up at any time he wanted to go use the facilities or offered him refreshments? Well, Your Honor, I would point out that the door was left open when the detective left for a moment. But even the district court found that, I'll quote, the police station was a secure facility and that if defendant wanted to leave, he needed an escort. The police station was a police-dominated environment. That's what the district court found. Well, that's true of every police station. But what's unusual about this particular interrogation is that, I mean, we've seen interrogations where the suspect is handcuffed to a pipe inside the interrogation room, and the interrogator is literally two feet away from the face of the suspect in conducting the interrogation, and the door is closed and locked so that he can't get out without a key. And this is a different kind of an interrogation than we normally see. I would point the Court to Thompson v. Keohane, where the United States Supreme Court said this was a case in which a husband was accused of killing his wife. They invited him to the police station. They said, come and pick up your wife's belongings. He went there. Only then was he told that he was a suspect. They never handcuffed him. They told him that he was going to be free to leave. They told him that he was free to leave at any time. They told him they weren't going to arrest him. They didn't arrest him. They let him go. Nonetheless, the United States Supreme Court said even though the detective said, you're free to leave, and even though he wasn't handcuffed, and even though he wasn't arrested and told he wouldn't be arrested, the same facts we had here, the U.S. Supreme Court said that it had to be remanded because on those facts alone, you can't say that he was necessarily not in custody. And so the U.S. Supreme Court had concerns, and I would suggest it's a very similar factual scenario to what we have here. And given that, really, you have the district court saying, look, there's this kind of magic incantation that the detective can say at the beginning of the interrogation, and that really undoes everything else. Well, he said it more than once. Well, the other times, he just said that I'm not going to arrest you right away. And as the district court found, that was only conditioned upon him continuing to stay there and continuing to give incriminating statements. He said to him, no matter what you tell me, you're not going to be arrested. And the district court found that to mean, and based upon the other evidence that the district court had before it, that it was conditioned upon him confirming the incriminating allegations against him and staying there. And so I would suggest that those other statements that he wasn't going to arrest him shouldn't be given much weight, given the district court's findings. I would like to talk about the Court's exclusion of the expert witness. Mr. Antone offered the testimony of Dr. Richard Leo, an expert on the social psychology of interrogations and false confessions. Now, in Crane v. Kentucky, the U.S. Supreme Court had said that the physical and psychological circumstances surrounding an interrogation is something that the jury is entitled to hear. And the Court said, indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered. If the defendant is innocent, why did he previously admit his guilt? So is your position that this evidence is admissible in every case? I couldn't make a broad claim that's admissible in every case. Well, you write Daubert off the books. Well, I would suggest, first of all, in terms of Daubert, we've got two – there's two aspects. One is the reliability. The district court, the government never contested that this person was qualified, that the testimony he gave – Well, before we get to the actual Daubert hearing itself, if – I understand your answer to be, no, I'm not saying that this evidence is admissible in every case. Then my follow-on question is, if that's true, then a Daubert hearing should have been held. And one was held. Correct. Right? And don't we review the district court's determination on exclusion for abuse of discretion once the Daubert hearing is conducted? Well, but in this case, I think he found the expert qualified, but then he felt that this testimony wasn't going to be relevant, so. Right. And what's our standard of review of that determination? The standard of review is for the – whether or not the district court correctly applied the correct legal standard is de novo. The factual findings are reviewed for abuse of discretion. But what are you – Go ahead. What are you challenging? Well, several things. First of all, the district court says that this is common knowledge and it wasn't going to be helpful to the jury, and it invades the province of the jury. What's our standard of review in resolving that challenge? What type of determination was that? I would suggest that there are aspects where he just – the district court misapplied the law, and as to that aspect, the court can apply. What law did he misapply? Okay. Well, first of all, I would suggest that he misapprehended the helpfulness standard, because we have – the issue is whether or not this would be helpful. The – the – He identified it correctly. He identified the correct issue. He identified that his role was to determine whether or not the testimony of the expert would be helpful to the jury. So how did he misapprehend the standard by making that determination? Well, because – let me give you – the district court said that because Mr. Antone did not have a medication problem or a problem with mental illness, that he therefore – that this would not be helpful to the jury. But it's precisely in that kind of situation where such an expert is so important, because as – as the expert would have said, most people believe that innocent people don't confess unless they're mentally ill. But you're taking issue with the district court's interpretation of the standard, not the – the identification of the standard. There are other aspects where it's very clear that the court seemed to misapply the standard. Wasn't – wasn't the court's concern in applying that standard that what Dr. Leo was really doing was telling the jury this confession is false and that that's what invaded the province of the jury? Because it has to make that determination. Well, but – but that's – let me give you an example. First, can you answer the question? Yes. Yes or no? Isn't that what the district – that's what I read in the district court report. That's what the district court found. But I would suggest – and it was saying that by inference. But it was a – specifically we made clear that Dr. Leo was not going to testify to that ultimate conclusion, whether this was a false confession. He was just going to give the jurors the tools from which to evaluate certain social psychology that applied to the – to this interrogation that they might not otherwise understand. For example, the child sexual abuse accommodation syndrome is admissible in Federal child sexual abuse trials as in Brodett v. Canberra, 350 Fed Third 985. This circuit held that such testimony is admissible. Has a false confession testimony been admitted in any courts in the circuit? In this circuit? Yes. In the Northern District of California, it has been admitted in a district court. And I see that I'm – I'd like to reserve the balance of my time. Okay. Very well. We'll hear from the government. May it please the Court, Celeste Corlett here on behalf of the United States. The district court did not err when it partially denied the defendant's motion to suppress his statements. Looking at the totality of the circumstances, the defendant was not under formal arrest or restraint of movement associated with the arrest. There's at least a dozen different factors that support that he was not under formal arrest. He was told he was free to leave. The officer actually left the interview room and left the doorjar. The defendant chose the location. He wanted to come to the police station as opposed to his home. He chose the date. He chose the time. The defendant drove himself to the station. He wasn't accompanied by police officers. He wasn't handcuffed during the interview. The officer was approximately 6 feet from the defendant. There's only one officer in the room with him. And the defendant never asked to leave the interview. He never – Counsel, ordinarily, the Miranda warnings would be given, but just because this was an inexperienced individual who really hadn't been trained as to how to conduct an interrogation, is that kind of the setting that we have here? No, I don't believe that was. He was at the beginning of his investigation. He had interviewed the victim. He had partially or had interviewed in part some of the other witnesses, but he had not completed the interview. And obviously, since that was the person the victim had said – Pardon me? He didn't give Miranda warnings. Is that correct? That is correct. So it's your position that he did not intend to give Miranda warnings because he was aware it was a – it was not a custody interview? Yes. Is that your argument, that that was intentional on his part? That he did not believe this was a custody situation. That's correct. He even stated that in trial in his testimony, that he did not believe he was in custody. Just protect himself. Officers will always give the Miranda warnings. So we're coming into kind of uncharted territory here. Well, there's several cases, as we cited too in our brief, where Miranda hasn't been given. And it is while they're still conducting their interview or their investigation. One of the other factors that I think is important also is while the district court in its findings said that the interview was an hour and 45 minutes, that was the entire interview. As you know, at some point the district court ruled that part of the statements would be suppressed. The part of the interview that we're talking about that defense counsel is claiming because this was a partial suppression of statements, the part of the interview that he's claiming should not have come in was only 45 minutes and 8 seconds. Well, I guess the issue for us is, did he feel free to leave? That's one of the factors. That's not the only factor, because – What else is there? It's all – it's, as I said, the totality of the circumstance, and it's whether or not his restraint of movement is associated with the rest. Free to leave is just one of those factors, and obviously that was one of the factors the district court found. And that was as defense counsel – What are the other factors? Yes, counsel, that's the ultimate question. Did he feel free to leave? I think that's one of the factors, but I don't believe it's the only question to answer, because in Stansford, the Supreme Court case, it's not – the standard is not, does he feel free to leave? The standard is, was he under formal arrest or restraint of movement associated with arrest? Different ways of saying the same thing. I think it's more. I think it's more than just saying, are you free to leave? Now, would a reasonable person in that situation feel free to leave? And I do believe that's one of the factors, but I think under – as the Supreme Court sentence stands for, it was a restraint of movement associated with arrest, and I think whether a reasonable person would feel free to leave is one of those factors that you look at, in addition to the whole custody situation, or the whole – I'm sorry, the whole interview situation, and whether or not those factors support it. Defendant's counsel had also mentioned that the agent had felt he had a strong case or that he was the – the defendant was the focus of the interview, but again, Stansford says the determination of custody is the objective circumstance of the interrogation. It's not whether or not the defendant is the focus of the interview. Well, I guess what puzzles me is I know we don't follow any longer the focus of the – the subjective focus of the police investigation, but as you say, he'd already talked to the victim. He'd talked to other witnesses who had been victimized by Mr. Antone in the past. He knew about his priors, and at one point in the interview, he confronts him and says, look, I've got enough to arrest you right now. I'm kind of – as with Judge Fletcher, I'm at a loss to understand why a police officer would not, just to protect himself, want to administer Miranda warnings, just to avoid this appeal. I don't think that the – first of all, the officer's subjective belief of whether he had enough evidence to arrest the defendant should go to whether or not he was in custody, because obviously you can have bare, minimal evidence. The police officer could be very overconfident and believe that he had enough to arrest someone, and he doesn't. So I don't believe that that goes to whether or not he was in custody, because it really is a totality of the circumstances. It's not the subjective belief of the officer. And in this case, in the totality of the circumstances. Well, but it's part of the equation if he confronts him with the evidence, which he did. Yes. I agree with that. That is part of the evidence, part of the equation. But in this case, he wasn't confrontational in the way that the other cases have shown, where someone is yelling, is being aggressive. And we did submit the tape of the interview that both the jury heard, that the district court heard before it made its ruling. And if you haven't had a chance to listen to it, I encourage you to, because the tone of the officer's interview is expressed so well when you listen to that tape. And, again, also when you listen to the tape, you'll see that the actual interview that we're talking about is only 45 minutes and 8 seconds, I believe it is. It's not the full hour and 45 minutes. Well, I think it comes through in the transcript that he's very respectful, because he's a tribal elder, he's a former tribal judge. And he clearly says a lot of things that most investigators wouldn't say in terms of talking about his own family and his own background. It's obviously a very kind of a friendly sort of a discussion. I agree with you. I guess that's part of the demeanor, if you will. Absolutely. And, Your Honor, if I could go on to the next issue as to admitting the evidence under Rule 413. Again, we argue that the district court did not abuse its discretion by admitting that evidence. 413 is a specific rule allowing the admission of the specific evidence. And this rule essentially establishes the presumption, though it's not a blank check, for favoring the admission of this type of evidence. And it is because evidence of prior sexual conduct is so important. And the courts have said that you should evaluate on the five factors of similarity, closeness, frequency, the intervening events, and the necessity of the evidence. And in this case, the factors favor admission of the prior offenses. And here, as far as the frequency, the prior offense actually involved ten kids, multiple events. And in this instance, the district court was very judicious in only allowing two of those ten events. So he was weighing those factors and not overwhelming the jury with that information. The prior event was almost identical. The method of what he did, the way that he touched the victims on their genitals and also that he waited until they were asleep in his home. The incident, while it was 14 years ago and is a significant amount of time, it's not significantly different than in LeMay where it was approximately 12 years. Additionally, it's important to remember that over nine of those years, of the 14 years, the defendant was either in prison or in a halfway house because of this prior event and because of his violating of supervised reliefs. So he didn't even have much of an opportunity to re-offend. I have already mentioned the frequency intervening. Defense counsel said there were no intervening events. In fact, he violated supervised reliefs multiple times, and in those times it was having contact with other children. I'm not saying it was sexual contact, but it definitely goes towards an intervening event. And as to the necessity, the defense counsel argued there was no physical evidence. Defense counsel argued the child was a liar. The defense counsel also questioned the child's memory, and this testimony of the other victims helped corroborate what the victim had said. And as LeMay stated on page 109 – I'm sorry, 1029, this is precisely the manner contemplated by the court – I'm sorry, by Congress in enacting Rule 413. Counsel, could you address the exclusion of the expert testimony? Yes, Your Honor. Again, we believe the district court did not abuse its discretion by precluding this evidence, and if you look at SCR 92, this is when the district court's denying the defendant's motion for a new trial, and he specifically explains his basis for that, and that was that the expert testimony was not necessary to point out the tactics  because the defense counsel questioned the officer for many, many pages of transcript, as you know, regarding his interrogation techniques, bringing out these things that he said were suggestive, that were leading, that were not factual. Defense counsel also argued that the officer fed the defendant facts. Defense counsel also argued that it was coercive. All these things the jury heard. So he basically took Dr. Leo's outline and used it to cross-examine the detective. Exactly, and he used that both in his opening, in his closing, and the district judge made this decision after he'd already heard the defendant's opening argument, the victim's testimony, the cross-examination by defense counsel of the victim that included questioning her on a lot of her facts,  where, again, he brought out everything that Dr. Leo was going to testify to. And, importantly, the jury themselves heard the interview. They heard these tactics defense counsel was arguing. They heard the defendant's responses, which are many times just uh-huh was what some of the responses were. So the statements, and remember, these are a limited amount of statements that actually did come in. It wasn't actually what was called the confession that the district court suppressed. It was all of those statements that were made before the district court had suppressed it. I'm sorry. I want to make sure I understand. The Daubert hearing occurred mid-trial? Is that what you're saying? That's right. There was some preliminary hearing regarding it, and then the district court said after he heard more evidence, then he would make a determination. And then that's when that hearing was held. Well, there's no question that this individual was qualified. So the real question is whether the testimony would be helpful to the jury and whether the expert would really be saying that this guy is innocent, which would be a decision which should be reserved for the jury. Those would be the concerns. Yes, that's correct. And including the credibility of the defendant. And as we've talked about, the standard here is in admitting or excluding evidence is considerable deference to the district court and whether or not it's more likely than not that it affected the verdict. And since all of the information defense counsel wanted Dr. Leo to testify to was already presented to the jury, it is not more likely than not that it affected the jury. Counsel, I just want to make sure. Had the detective testified and been cross-examined prior to the time the district court suppressed or denied? Yes, Your Honor. Unless the Court has any other questions, I would submit on the record. I think not. Thank you very much. Thank you. Mr. Raynor, I think you have about a minute and 15 seconds left. Thank you, Your Honor. To answer one of the questions, this detective was inexperienced. This was either his first case or one of his first cases as a detective. He had been a police officer. Well, but the jury had heard all that right on cross-examination. Yes. I mean, what's your response? It seems to me that it does cast this in a different light if the Daubert hearing occurs after the judge has already heard a significant amount of the testimony and you've already scored a lot of points on cross-examination. I think, Your Honor, the problem is that we couldn't have presented all the information that the jury would have needed to know, to be helpful to the jury, for them to understand that innocent people do confess. Most people think that unless someone's mentally ill, they wouldn't confess. But at that point, it's getting awfully close to suggesting to the jury that Mr. Antone's confession was false because he's really innocent and didn't mean to confess. Your Honor, I'd point to U.S. v. Vallejo, 237-FED-1008. Court found the testimony of a counselor about difficulties of English learners in special education would not infringe on the role of the jury to determine credibility. The court is free to decide whether any – the jury is free to decide whether any discrepancies in the story were due to his lack of credibility rather than a communications disorder. And the court there found it was not harmless. Thank you. Thank you very much, counsel. The case just argued is submitted. We'll take our mid-morning recess and then hear argument in the last two cases on the calendar.
judges: Fletcher B. , Tallman, Rawlinson